**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. KOENIG, Derivatively on Behalf of BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORPORATION I, | Case No.: 1:22-cv- |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| TODD M. FRUCHTERMAN, JONATHAN M. ROTHBERG, LARRY ROBBINS, DAWN CARFORA, ELAZER EDELMAN, JOHN HAMMERGREN, GIANLUCA PETTITI, LOUISE PHANSTIEL, and ERICA SCHWARTZ, | **JURY DEMAND** |
| Defendants, | |
| and | |
| BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORPORATION I, | |
| Nominal Defendant. | |

Plaintiff Samuel I. Koenig, by his undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint.  Plaintiff makes these allegations upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, filings by Butterfly Network, Inc. f/k/a Longview Acquisition Corporation I ("Butterfly" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other information regarding Butterfly.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by the Plaintiff on behalf of nominal defendant Butterfly against the members of its Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duty and violations of the federal securities laws, which resulted in material damage to the Company and irreparably harmed its reputation.

2.      Butterfly is a digital health company founded by Defendant Jonathan M. Rothberg ("Rothberg").   In November 2020, Butterfly announced that it would merge with Longview Acquisition Corporation I ("Longview"), a Special Acquisition Company ("SPAC") (the "Merger"), with Butterfly Network, Inc. continuing as the surviving entity, of which Defendant Rothberg would be the controlling shareholder.

3.      In numerous public filings, earnings calls, and presentations in the months following the Merger, the Company represented that Butterfly was poised for tremendous growth based on its competitive strengths and market opportunities. Despite identifying a material weakness in its internal controls and having to restate several financial statements shortly after the Merger, the Company represented that its internal controls over financial reporting were adequate and that the Board was actively engaged in risk oversight. Based on these assurances, the Company released robust financial guidance for 2021, including projections of revenue growth between 64% and 73% year over year.

4.      However, in November 2021, the Company reported disappointing third-quarter numbers including negative 35% gross margins and falling well short of the revenue and gross margin guidance provided to investors and financial analysts for fiscal year 2021.

5.      Following the disappointing financial results and missed guidance, the Company's stock dropped precipitously, falling close to 13% in one day. In the wake of the stock drop,

aggrieved investors filed a securities class action lawsuit against the Company, several of the Individual Defendants, and a number of the former officers and/or directors of Longview. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, its officers, and its directors.

6.      Compounding the damage to the Company and its stockholders, in May 2022, Fujifilm Sonosite, Inc. ("Fujifilm") filed a lawsuit against Butterfly for patent infringement, alleging that Butterfly violated seven patents relating to its handheld ultrasound products, further demonstrating the lack of internal controls and corporate governance procedures at the Company.

7.      The Individual Defendants owed and owe Butterfly and its stockholders the highest fiduciary duties of loyalty, good faith, due care, and candor.  As such, the Individual Defendants were required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the validity of the Company's patents.

8.      As a result of the Individual Defendants' breaches of fiduciary duty, Butterfly has sustained substantial damages and irreparable injury to its reputation.  Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague Butterfly.

9.      Plaintiff did not make a demand before bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this

3

action, Butterfly will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contact with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.    This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1931(b), where the Company is incorporated and where it conducts substantial business.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Samuel I. Koenig has been a shareholder of Butterfly since December 3, 2020, and has held Butterfly common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

B.      **Defendants**

1.      **Nominal Defendant Butterfly Network, Inc.**

15.      Nominal defendant Butterfly is a company duly incorporated under the laws of the State of Delaware.  Its principal executive offices are located at 530 Old Whitfield Street, Guilford, Connecticut. Butterfly common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BFLY."

2.      **The Individual Defendants**

a.      **Defendant Fruchterman**

16.      Defendant Todd M. Fruchterman ("Fruchterman") is a Butterfly director since January 2021 and the Company's President and Chief Executive Officer ("CEO") since the Merger. According to the Company's proxy statement filed with the SEC on May 2, 2022 (the "2022 Proxy"), Fruchterman beneficially owns 757,398 shares of Butterfly Class A common stock. According to the 2022 Proxy, Defendant Fruchterman received the following compensation in 2021:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | OTHER COMPENSATION | TOTAL |
|------|--------|--------------|---------------|--------------------|-------|
| 2021 | $687,500 | $17,025,602 | $12,586,305 | $1,244,510 | $34,816,164 |

b.      **Defendant Rothberg**

17.      Defendant Rothberg founded Butterfly in 2011 and has served as the Chair of the Board since its inception. Rothberg is the Chair of the Nominating and Corporate Governance Committee and a member of the Technology Committee. Before the Merger, Rothberg served as the CEO of Butterfly from March 2014 until April 2020. Rothberg is the founder of 4Catalyzer, a startup accelerator focusing on physics, math, and life sciences. 4Catalyzer has incubated eight

5

companies including, AI Therapeutics, Hyperfine Research, Quantum-Si, Butterfly, and Tesseract Health ("Tesseract").

18.     According to the 2022 Proxy, Rothberg is a controlling shareholder of Butterfly with beneficial ownership of 100% of the Company's Class B common shares and 10,011,285 Butterfly Class A common shares, with a total voting power of 76.8%.[1] Defendant Rothberg is a consultant to the Company's CEO and Board and receives compensation of more than $16,000 per month and further stock options.

19.     Rothberg received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | AWARDS OPTION | TOTAL |
|------|---------------------------|--------------|----------------|-------|
| 2021 | $55,534 | $296,033 | $150,338 | $501,725 |

### c.     Defendant Robbins

20.     Defendant Larry Robbins ("Robbins") is a Butterfly director since February 2020 and a member of the Nominating and Corporate Governance Committee and the Compensation Committee. Robbins was Longview's Chairman from its inception until the Merger. Robbins received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|------|---------------------------|--------------|----------------|-------|
| 2021 | $48,583 | $243,405 | $150,338 | $442,326 |

21.     Robbins is the Founder, Portfolio Manager, and CEO of Glenview Capital Management ("Glenview"), a hedge fund. Glenview beneficially owns 17,330,506 Butterfly Class A common shares, amounting to 1.8% total voting power.

---

[1]     Each share of Butterfly's Class B common stock is entitled to 20 votes per share and each share of Butterfly's Class A common stock is entitled to one vote per share.

22.     In June 2021, HighCape Capital Acquisition Corp., a healthcare-focused SPAC, merged with Quantum-Si, one of the companies that was incubated through 4Catalyzer.[2] The merger was supported by a $425 million PIPE from institutional investors including Glenview. Defendant Rothberg is the Executive Chairman and a controlling shareholder of the combined company. Glenview currently controls more than 5% of the voting power at Quantum-Si.

23.     Rothberg founded Tesseract through his incubator, 4Cataylzer, in 2018. Glenview helped fund Tesseract's Series B financing round.

### d.     Defendant Carfora

24.     Defendant Dawn Carfora ("Carfora") is a Butterfly director since the closing of the Merger in February 2021 and a member of the Compensation Committee.

25.     According to the 2022 Proxy, Carfora beneficially owns 16,394 Butterfly Class A common shares and received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|------|---------------------------|--------------|---------------|-------|
| 2021 | $50,729 | $296,033 | $150,338 | $497,163 |

### e.     Defendant Edelman

26.     Defendant Elazer Edelman ("Edelman") is a Butterfly director since March 2021 and is a member of the Technology Committee. Edelman serves as an advisor to Tesseract, a company founded by Defendant Rothberg through 4Catalyzer.

---

[2]     Quantum-Si Press Release, https://ir.quantum-si.com/news/news-details/2021/Quantum-Si-Revolutionizing-Proteomics-Closes-Business-Combination-and-Will-Begin-Trading-Under-the-Ticker-QSI-on-the-Nasdaq-Stock-Exchange/default.aspx.

27.     According to the 2022 Proxy, Edelman beneficially owns 5,032 Butterfly Class A common shares and received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|------|---------------------------|--------------|---------------|-------|
| 2021 | $52,644 | $299,997 | $150,338 | $502,979 |

### f.      Defendant Hammergren

28.     Defendant John Hammergren ("Hammergren") is a Butterfly director since the closing of the Merger in February 2021 and a member of the Audit Committee and the Nominating and Corporate Governance Committee. Hammergren served as the Chairman of the Board and President and CEO of McKesson Corporation ("McKesson") for almost twenty years until resigning in 2019.

29.     According to the 2022 Proxy, Hammergren beneficially owns 124,484 Butterfly Class A common shares and received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|------|---------------------------|--------------|---------------|-------|
| 2021 | $57,417 | $296,033 | $150,338 | $503,788 |

### g.      Defendant Pettiti

30.     Defendant Gianluca Pettiti ("Pettiti") is a Butterfly director since the closing of the Merger in February 2021 and is Chair of the Compensation Committee and a member of the Audit Committee.

31.     According to the 2022 Proxy, Pettiti beneficially owns 22,399 Butterfly Class A common shares and received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2021 | $66,250 | $296,033 | $150,338 | $512,621 |

**h.    Defendant Phanstiel**

32.    Defendant Louise Phanstiel ("Phanstiel") is a Butterfly director since the closing of the Merger in February 2021 is the Chair of the Audit Committee and a member of the Compensation Committee. Phanstiel is Chair of the board of Myriad Genetics, Inc. ("Myriad") since 2020 and a Myriad director since 2009.

33.    According to the 2022 Proxy, Phanstiel  beneficially owns 64,434 Butterfly Class A common shares and received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2021 | $68,458 | $296,033 | $150,338 | $514,829 |

**i.    Defendant Schwartz**

34.    Defendant Erica Schwartz ("Schwartz") is a Butterfly director since September 2021 and is a member of the Nominating and Corporate Governance Committee and Technology Committee.

35.    According to the 2022 Proxy, Schwartz received the following compensation for serving as a Butterfly director in 2021:

| YEAR | FEES EARNED/ PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2021 | $18,049 | $299,995 | -- | $318,044 |

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

36.    By reason of their positions as officers or directors of Butterfly and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants

owed and owe Butterfly and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Butterfly in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Butterfly and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Butterfly, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the New York Stock Exchange, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Butterfly's financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Butterfly's management, policies, and internal controls.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and Butterfly and were always acting within the course and scope of such agency.

40.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Butterfly.

41.     Butterfly's Corporate Governance Guidelines state that "[d]irectors must fulfill their responsibilities consistent with their fiduciary duties to stockholders, in compliance with all applicable rules and regulations and subject to the provisions of the Charter and Bylaws."

### A.     Additional Duties Under The Code Of Business Conduct And Ethics

42.     Butterfly's Code of Business Conduct and Ethics (the "Code of Conduct") applies to all "directors, officers and employees."

43.     The purpose of the Code of Conduct is to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC], as well as in other public communications made by or on behalf of the Company;

- promote compliance with applicable governmental laws, rules and regulations;

- deter wrongdoing; and

- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

44.     The Code of Conduct states:

It is the responsibility of each person to conduct themselves in an ethical business manner and also to ensure that others do the same. If any person violates these standards, he or she can expect a disciplinary response, up to and including termination of employment or other relationship with the Company or, potentially, legal action. If any person becomes aware of any breach of the Code, the person is obligated to report violations to the Corporate Compliance Officer, to the chairperson of the Audit Committee of the Board (the "Audit Committee") or to the Whistleblower Compliance Hotline that the Company has engaged to receive such reports[.]

45.     The Code of Conduct mandates honest, ethical, and fair conduct, requiring each director, officer and employee to, *inter alia*:

- act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests;

- observe all applicable governmental laws, rules and regulations;

- comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data;

- adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices;

- refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice; and

- protect the assets of the Company and ensure their proper use.

46.     With regard to "Disclosure," the Code of Conduct requires:

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate.

Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self regulating organizations and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer…and Chief Financial Officer…and each subsidiary of the Company (or persons performing similar functions), and each other person who typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company. Each person must promptly bring to the attention of the Chairperson any information he or she may have concerning (a) significant

deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to  record, process, summarize and report financial data or (b) any fraud that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

47.     The Code of Conduct requires the keeping of accurate books, records, and financial statements:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

48.     The Code of Conduct has additional requirements applicable to executive officers including, *inter alia*, to:

- Act with honesty and integrity, avoiding actual or apparent conflicts between personal, private interests and the interests of the Company, including receiving improper personal benefits as a result of his or her position.

- Disclose to the CEO (if a senior financial officer) and the Board any material transaction or relationship that reasonably could be expected to give rise to a conflict of interest.

- Perform responsibilities with a view to causing periodic reports and documents filed with or submitted to the SEC and all other public communications made by the Company to contain information that is accurate, complete, fair, objective, relevant, timely and understandable, including full review of all annual and quarterly reports.

- Comply with laws, rules and regulations of federal, state and local governments applicable to the Company and with the rules and regulations of private and public regulatory agencies having jurisdiction over the Company.

-  Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting or omitting material facts or allowing independent judgment to be compromised or subordinated.

**B.     Additional Duties Of The Members Of The Audit Committee**

49.     The members of the Company's Audit Committee have additional duties outlined

in the Audit Committee Charter, including requirements that its members:

- Oversee the Company's enterprise risk management process and help the full Board understand the Company's material enterprise risks and contingencies. The Committee will discuss with management, and the independent auditor to the extent applicable, the Company's policies with respect to enterprise risk assessment and risk management, including the Company's significant financial and enterprise risk exposures and the actions management has taken to limit, monitor or control such exposures.

- Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

- Meet periodically with outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company;

- Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

- Review the Company's program to monitor compliance with the Company's Code of Business Conduct and Ethics, and meet periodically with the Company's Compliance Committee to discuss compliance with the Code of Business Conduct and Ethics;

- Review with management and the independent auditors the results of the year-end audit of the Company and the Company's annual financial statements and Form 10-K, including any comments or recommendations of the independent auditors, prior to the release of earnings and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K;

- Review with management and the independent auditor each Form 10-Q prior to its filing or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under Statements of Auditing Standards;

14

- Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies for each completed fiscal period prior to their release; and

- Review and, where appropriate, make recommendations to the Board regarding: capital expenditure budgets and proposed capital expenditure projects that may have a material impact on the Company's financial position; policies relating to the Company's liquidity requirements, including cash flow, cash management and investments.

### C.    Additional Duties Of The Members Of The Nominating And Corporate Governance Committee

50.    The members of the Company's Nominating and Corporate Governance Committee have additional duties outlined in the Nominating and Corporate Governance Committee Charter, including requirements that its members:

- Develop and recommend to the Board, review the effectiveness of, and recommend modifications as appropriate to, the Corporate Governance Guidelines and other governance policies of the Company.

- Assess annually whether the composition of the Board as a whole reflects the appropriate balance of independence, sound judgment, business specialization, technical skills, diversity and other desired qualities, and recommend any appropriate changes to the Board.

- Review emerging corporate governance issues and practices, including proxy advisory firm policies and recommendations.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Butterfly Is Formed Through A Merger With Longview

51.    Butterfly, founded by Defendant Rothberg, is a digital health company selling ultrasound devices that turn complex ultrasound processes into one connected portable system to "help offer better, more efficient care."  The Company's mission is to enable universal access to superior medical imaging, making high-quality ultrasound affordable, easy-to-use, globally

15

accessible, and intelligently connected using its patented Ultrasound-on-Chip™ semiconductor technology. The Company has two primary products, the Butterfly iQ, a hand-held and single-probe whole body ultrasound system; and the Butterfly iQ+, a point-of-care ultrasound imaging device that connects with a smart phone or tablet.

52.     On November 20, 2020, close to a year into the COVID-19 pandemic, Butterfly filed, with the SEC, a Current Report on Form 8-K attaching a press release issued by Butterfly on that date, announcing the Merger with Longview Acquisition Corporation I[3] whereby Butterfly would become a subsidiary of Longview and change its name to "Butterfly Network, Inc."

53.     On February 1, 2021, Longview filed a Proxy Statement with the SEC shortly before the consummation of the Merger (the "Merger Proxy"). Defendants Rothberg, Robbins, and Fruchterman solicited shareholders to, among other things, approve the Merger and elect Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel to the Board of Butterfly Network, Inc.

54.     On February 12, 2021, Longview shareholders voted to approve the Merger at a special shareholder meeting.

55.     On February 16, 2021, the Merger was consummated, Butterfly changed its name, and its Class A common stock began trading on the New York Stock Exchange.

56.     As a result of the Merger, Butterfly received approximately $589 million prior to transaction fees, including approximately $414 million of cash held in Longview's trust account and $175 million from private placement ("PIPE") investors, including Glenview.[4]

---

[3]     Longview is a special purpose acquisition company ("SPAC") that is an affiliate of Glenview Capital Management, a hedge fund founded and run by Defendant Robbins. Longview raised $300 million in its initial public offering on May 1, 2020.

[4]     Post-Merger, Glenview beneficially owns 17,330,506 Butterfly Class A common shares, amounting to 1.8% total voting power.

### B. Rothberg Controls Butterfly After The Merger

57.     Defendant Rothberg assumed control over Butterfly following the Merger, with control over 76.8% of the Company's vote. According to the 2022 Proxy, this gives Rothberg control over a number of corporate matters, including, "the power to elect each of the nominees named in [the proxy], ratify the appointment of our independent registered public accounting firm, approve the compensation of our named executive officers, and approve the frequency of holding an advisory vote on the compensation of our named executive officers every year."

58.     According to the 2022 Proxy, the Company is a "controlled company" and purportedly does not need to have a majority of independent directors:

> [A] company of which more than 50% of the voting power for the election of directors is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including the requirements (1) that a majority of its board of directors consist of independent directors, (2) that its board of directors have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (3) that its board of directors have a nominating and corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities. As a result, we may utilize one or more of these exemptions, and you may not have the same protections afforded to stockholders of companies that are subject to all of these corporate governance requirements. For example, our nominating and corporate governance committee is not currently composed entirely of independent directors.

59.     The 2022 Proxy further disclosed that Butterfly entered into an Advisory Agreement with Rothberg under which Rothberg serves as a consultant for the current CEO and the Board:

> In connection with the consummation of the Business Combination, we entered into an Advisory Agreement with Dr. Rothberg…pursuant to which Dr. Rothberg advises our Chief Executive Officer and the board of directors on strategic matters, and provides consulting, business development and similar services on matters relating to our current, future and potential scientific and strategic initiatives and such other consulting services reasonably requested from time to time. **As compensation for Dr. Rothberg's services under the Advisory Agreement, we**

**pay Dr. Rothberg a consulting fee of $16,667 per month during the term of the Advisory Agreement.** The term of the Advisory Agreement will continue until terminated by us or Dr. Rothberg…. **In December 2020, the Legacy Butterfly board of directors granted 1,000,000 restricted stock units to Dr. Rothberg.** The RSUs vest in equal quarterly installments over two years, beginning on March 31, 2021, without regard to Dr. Rothberg's continued service to the Company, with full acceleration of vesting in the event of Dr. Rothberg's death or disability or a change in control of the Company.

### C.     Butterfly And The Individual Defendants Misrepresent The Company's Financial Condition And Business Prospects

60.     In the Merger Proxy, Butterfly and the Individual Defendants provided a positive overview of the Company's growth in product sales and revenues:

> We sold and shipped approximately 12,900 devices in the year ended December 31, 2019, and approximately 12,500 devices in the nine months ended September 30, 2020, an increase from approximately 7,900 devices in the nine months ended September 30, 2019, representing a growth rate of approximately 58% period over period. We generated total revenue of $27.6 million and $1.5 million in the years ended December 31, 2019 and 2018, respectively, and $30.6 million and $16.8 million for the nine months ended September 30, 2020 and 2019. We also incurred net losses of $99.7 million for the years ended December 31, 2019 and $139.8 million in the nine months ended September 30, 2020.

61.     The Merger Proxy emphasized the Company's competitive strengths, including strong topline growth:

> ***Strong Topline Growth, with Subscription-based Recurring Revenue to Enable Long-Term Expansion in Gross Margin.*** Since our commercial launch of our Butterfly iQ device in 2018, we have experienced strong topline growth. Our total revenue for the nine months ended September 30, 2020 and 2019 was $30.6 million and $16.8 million, respectively, representing an increase of $13.8 million, or 82.1%. Our total revenue for the years ended December 31, 2019 and 2018 was $27.6 million and $1.5 million, respectively, representing an increase of $26.1 million. We continue to seek to grow our user base of Butterfly iQ practitioners and our enterprise sales to health systems to help us further penetrate the global ultrasound market.

62.     The Merger Proxy detailed the Company's expectation that subscription revenue would rise, and gross margins would improve:

18

During the nine months ended September 30, 2020, our product revenue represented approximately 84.0% of our total revenue for the period, and our subscription revenue represented the remaining 16.0% of our total revenue for the period. As our devices continue to be adopted by more healthcare practitioners and practitioners in the Butterfly network continue to use our devices, we expect total subscription revenue to increase and that our subscription revenue will become an increasingly important contributor to our overall revenue. Because the cost and associated expenses to maintain our software are less than the costs and associated expenses of manufacturing and selling our device, we also anticipate an improvement in our gross margin over time.

63.    The Company emphasized the reduction in revenue fluctuation due to the "recurring nature of subscription," which "continues to improve our margin." The Company represented that "add-on features and platform associated accessories" and "applications and techniques developed on [the] platform"  would create  "additional revenue at minimal cost continuing to create margin improvement, while increasing growth."

64.    The Merger Proxy touted the Company's industry and market opportunity based on its innovative and cheaper alternatives to traditional imaging and its advantages over its handheld competitors. The Merger Proxy explained that traditional imaging "limit[s] wider access and usage due to high upfront costs" of  "[$]45,000 to $60,000 per new system in addition to burdensome…contracts," in contrast to less expensive handheld devices, "ranging from $5,000 to $7,000 per probe." The Merger Proxy described the advantage of the Company's iQ+ which requires a single probe versus handheld competitors' "two to three probes to cover a comparable range of cleared indications."

65.    The Merger Proxy emphasized Butterfly's ability to lead the new hand-held device markets:

Historically, these competitive point-of-care / handheld competitors lack the AI capabilities that the Butterfly iQ+ provides healthcare practitioners and are less core focal points of large capital equipment focused sales forces, **which creates**

**a unique opportunity for Butterfly to not only disrupt and take care in the existing market, but create and be the leader in new markets**.

66.    The Merger Proxy focused on the vast untapped global ultrasound market valued

at approximately $8 billion with handheld devices only cornering 3% of the market at the time:



67.    The Company touted the potential to reach up to 40 million global healthcare

practitioners and an initial target market of 8 million practitioners:

> We believe there is strong interest from healthcare practitioners to utilize handheld ultrasound devices in their day-to-day work, as primary care practitioners represent our largest group of users. **We believe the Butterfly iQ device has the potential to reach up to 40 million global healthcare practitioners, across both developed and emerging markets**. **Of the approximately 40 million global healthcare practitioners, we view a subset of approximately eight million as our initial target market**[.]…Beyond this initial market, we believe there are approximately nine million additional medical doctors (12 million total) and approximately 23 million additional nurses (approximately 28 million total) that would benefit from use of handheld ultrasound devices.



68.     The Merger Proxy represented that "New Butterfly will structure its corporate governance in a manner that Butterfly and Longview believe will closely align New Butterfly's interests with those of its stockholders following the Business Combination."

69.     The Merger Proxy represented that the Board would be extensively involved in risk oversight:

**Role of Board in Risk Oversight**

The board of directors will have extensive involvement in the oversight of risk management related to New Butterfly and its business and will accomplish this oversight through the regular reporting to the board of directors by the audit committee. The audit committee will represent the board of directors by periodically reviewing New Butterfly's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the audit committee will review and discuss all significant areas of New Butterfly's business and summarize for the board of directors all areas of risk and the appropriate mitigating factors. In addition, the board of directors will receive periodic detailed operating performance reviews from management.

70.    On February 16, 2021, Butterfly filed with the SEC an Amended Current Report on Form 8-K attaching a press release issued on that date announcing the closing of the Merger and reporting "unaudited 2020 full-year revenues are at least $45 million, representing a full-year growth rate of at least 63% compared to the full year 2019."

71.    On March 29, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K").[5]

72.    The 2020 10-K contained similar descriptions of the Company's competitive strengths and industry opportunities as contained in the Merger Proxy.

73.    In the 2020 10-K, the Company reported positive earnings including, *inter alia*, that total revenues for 2020 were $46.3 million, a 68% increase year-over-year from $27.6 million in 2019. Product revenues for 2020 were $38.4 million, an increase of 53% from $25.1 million in 2019, and Subscription revenues were $7.9 million in 2020, growing 216% from $2.5 million in 2019. The Company also reported a loss of $61.2 million, compared to a 2019 gross loss of $20.9 million, and a total gross margin for fiscal year 2020 of 132.4%, compared to 75.8% in 2019. The cost of revenue in 2020 was significantly impacted by non-recurring charges totaling $62.7 million.

74.    On the same day, the Company held an earnings call with investors and financial analysts to discuss the Company's fourth quarter and full year 2020 financial results. In the call, Defendant Fruchterman stated:

---

[5]    The 2020 10-K was signed by Defendants Fruchterman, Robbins, Rothberg, Carfora, Edelman, Hammergren, Pettiti, and Phanstiel.  Defendant Fruchterman executed a certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX") that the report fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

Last year, we made great progress in getting Butterfly into the hands of many different types of healthcare professionals, bringing our technology to new users and introducing new applications, important steps towards the achievement of our mission. And we are excited because as we listened to our customers, we are seeing many new use cases and opportunities emerge, guiding us as we work to rapidly develop new applications for our products. And as a result of our team's great, we reported a revenue increase of 68% year over year, demonstrating the excitement and demand for Butterfly technology in the marketplace.

75.     Fruchterman touted the benefits of the Merger which "enabled Butterfly to become a larger well-capitalized company that is primed for global growth and supports our robust investment in innovation" and expressed his excitement for "the longer term outlook for Butterfly, because we believe we have a groundbreaking solution and the team who knows how to realize its value."

76.     On May 12, 2021, Butterfly filed with the SEC an amendment to the 2020 10-K (the "2020 10-K/A"), which disclosed a material weakness in its internal controls.

77.     Despite the identified material weakness, in the 2020-10-K/A, Butterfly's management assured that "[n]otwithstanding this material weakness, management has concluded that our audited financial statements included in this Amendment are fairly stated in all material respects in accordance with GAAP for each of the periods presented therein."

78.     The Company reiterated its confidence that its internal controls over financial reporting were now effective stating that "[o]ther than the changes made to remediate the material weakness described above, there were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during the fourth quarter ended December 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

79.     On May 13, 2021, Butterfly filed with the SEC a Current Report on Form 8-K attaching a press release disclosing the Company's financial results for the first quarter of 2021:

**First Quarter 2021 Financial Results**

First quarter revenue increased 43.5% to $12.4 million from $8.7 million in the first quarter of 2020. Product revenue increased 33.1% to $9.6 million from $7.2 million in the first quarter of 2020. Subscription revenue increased 94.9% to $2.8 million from $1.5 million in the first quarter of 2020.

Gross profit for the first quarter of 2021 was $6.4 million, compared to a gross profit of negative $0.8 million in the first quarter of 2020. Adjusted gross profit, which includes a one-time adjustment for warranty accrual methodology, was $5.9 million.

Total gross margin for the quarter was 51.6%, compared to a negative 9.6% in the first quarter of 2020. Adjusted gross margin was 47.8%, compared to a negative 9.4% in the first quarter of 2020.

80.    In the press release, Defendant Fruchterman commented  that "[t]his year is off to a great start with healthy growth and increased customer excitement about the insights delivered by Butterfly's unique technology and our potential to advance medical imaging beyond current use cases."  Fruchterman praised the Company's "excellent progress expanding our commercial and organizational capabilities, driving partnerships that expand our reach across different care settings and specialties, as well as creating a dedicated team to transform veterinary medicine." Fruchterman added, "I am excited by the breadth of opportunities in front of us to democratize imaging, drive fundamental change in healthcare across care settings, and advance global health equity."

81.    In an earnings call with financial analysts and investors that day, Defendant Fruchterman stated the Company's technology provided "maximum flexibility" and allowed the Company to "develop solutions, both to deliver value and create new business models, and is Butterfly's point of key differentiation."  Fruchterman reiterated that "we are excited about the demand in the marketplace today" and reaffirmed the revenue guidance, promising "additional transparency for 2021."

82.     Fruchterman continued by reviewing the performance for the first quarter and giving an "update on our progress toward the near-term foundational goals laid out in our last earnings call reflecting a solid start to 2021." Fruchterman concluded:

> [W]e reported a revenue increase of 44% compared to the first quarter last year. We believe this demonstrates the excitement and demand for Butterfly technology in the marketplace. We continue to make strong progress in the first quarter towards putting Butterfly into the hands of users across different disciplines in healthcare. As our customer base expands, and the demand for our product grows, we expect a further broadening in the range of use cases and care settings where our solution can bring value. You have my commitment to provide more insight on commercialization and our anticipated milestones, as soon as it's appropriate to do so with a target of doing so by the end of the year.

83.     Then Chief Financial Officer ("CFO") Stephanie Fielding ("Fielding") detailed the financial results for the quarter and gave guidance for the remainder of fiscal year 2021:

> And finally, on to guidance, as Todd discussed earlier, now that he has been on Board for three months, and has had a chance to evaluate the business, we want to provide an update on our 2021 financial plan. We also expect to provide more transparency on our operating plans, which will inform our expectations for 2022 in the second half of this year.  **For the full year 2021, total revenue is projected to be approximately $76 million to $80 million, or 64% to 73% growth year-over-year. Gross margin is expected to be 43% to 47%.** And net loss is expected to be $135 million to $155 million. Adjusted gross margin is expected to be 42% to 46%. And adjusted EBITDA is expected to be negative $140 million to negative $160 million.

84.     Fielding represented that the revenue guidance "reflects the anticipated acceleration of our investment in enterprise sales, where we believe there are attractive opportunities to implement the Butterfly solution."

85.     Fielding concluded by reiterating the positive guidance regarding revenue growth and increased gross margins:

> **We expect revenue growth to accelerate in the second half of the year, and we expect the investments we are making to yield both near and long-term results.** Our guidance for gross margin and adjusted gross margin is influenced primarily by our expected revenue mix. The net loss and adjusted EBITDA guidance reflects the investments we plan to make in the business. We have opportunities to drive

growth through people and infrastructure; specifically we plan to invest in software solution enhancements designed to assist with customer workflows and AI to support insight and clinical decision making.

86.     On May 17, 2021, Butterfly filed with the SEC a Quarterly Report on Form 10-Q (the "1Q21 10-Q").[6] In the 1Q21 10-Q, the Company identified a material weakness in its internal controls over financial reporting, but represented that "[n]otwithstanding this material weakness, management has concluded that our unaudited financial statements included in this Quarterly Report on Form 10-Q are fairly stated in all material respects in accordance with GAAP for each of the periods presented therein."

87.     On June 16, 2021, Butterfly participated in the Cowen 6th Annual FutureHealth Conference. In a question-and-answer portion of the conference with Defendants Fruchterman, Rothberg, and other Butterfly executives, Fruchterman touted Butterfly's innovative devices which he described as "quite an engineering feat" and "[t]he best and the brightest, really creative thinking, thinking outside of the box." Fruchterman stated that it is one thing to "conceptualize things" but another, "very different thing to be able to realize it," and that Butterfly had done an even harder thing, taking a concept and making it manufacturable, reliable, and scalable."

88.     Fruchterman emphasized the strength of Butterfly's intellectual property:

So we have over 800 patents either issued or pending around the technologies, we have one of the world class manufacturing and development partners in TSMC.

                                        ***

So a lot of the things that as you think about ideas and making them a reality and those stumbling blocks have been worked through in what was an amazing feat over the last almost decade of technology. What's that's done is, it's brought a highly

---

[6]     The 1Q21 10-Q was signed by Defendant Fruchterman and he executed a certification pursuant to SOX that the report fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

disruptive technology to market that now enables us to start the next chapter of Butterfly, which is really realizing the value of this amazing technology.

89.     Fruchterman also confirmed the Company's ability to meet its previous guidance of $76 million in revenue for 2021, based on the Company's strong salesforce and  potential and actual sales:

> Right now, we've doubled our salesforce for direct, for enterprise and these are really advanced traps that are much more key account, solution-oriented to manage the complexity of an enterprise solution. . .we're reinforcing that with our education and our clinical support to help to get adoption throughout the institutions….
>
> ***
>
> And that's where we're spending a lot of our time right now and doing that as we're rebuilding the salesforce, we have -- I think great momentum . . . .
>
> ***
>
> [W]e have already have conversations going on at large enterprise accounts where we're talking top down implementation through entire functions to get the value realization of the deployment of a Butterfly solution.
>
> I've never been associated with the technology that's gotten to that level of conversation this fast ever…. [W]e have a lot of focus advocates that are turning to Butterfly to look at how to deploy a solution and we're working with them in different institutional accounts and we're still addressing direct user in different segments. **What I would say is it's all kind of coming together for us at a timeline and a scale never seen before.**

90.     On August 9, 2021, Butterfly filed with the SEC a Current Report on Form 8-K attaching a press release that announced the Company's financial results for the second quarter of 2021:

> **Second Quarter 2021 Financial Results**
>
> Second quarter revenue increased 40.0% to $16.5 million from $11.8 million in the second quarter of 2020. Product revenue increased 30.3% to $13.0 million from $10.0 million in the second quarter of 2020. Subscription revenue increased 94.3% to $3.5 million from $1.8 million in the second quarter of 2020.

Gross profit for the second quarter of 2021 was $8.2 million, compared to a gross profit of $0.2 million in the second quarter of 2020. Adjusted gross profit was $8.3 million, compared to an adjusted gross profit of $0.2 million in the second quarter of 2020.

Total gross margin for the quarter was 49.8%, compared to 1.4% in the second quarter of 2020. Adjusted gross margin was 50.2%, compared to a 1.6% in the second quarter of 2020.

91.     In the press release, Defendant Fruchterman confirmed the strong revenue growth and broad interest in the Company's products:

As we continue our journey as a public company, we achieved another quarter of strong revenue growth, while driving progress against our foundational goals. Our commercial expansion in the US and international markets reflects broad interest in Butterfly across a variety of use-cases and settings. Building for long-term growth, we also made leadership appointments adding expertise in innovation and IT infrastructure.

92.     On that same day, the Company filed with the SEC a Quarterly Report on Form 10-Q (the "2Q21 10-Q").[7]  As in the 1Q21 10-Q, in the 2Q21 10-Q the Company identified a material weakness in its internal controls over financial reporting, but represented that "our unaudited financial statements included in this Quarterly Report on Form 10-Q are fairly stated in all material respects in accordance with GAAP for each of the periods presented therein."

93.     On August 9, 2021, in an earnings call to discuss the financial results of the second quarter of 2021, Defendant Fruchterman detailed the Company's progress to its "near-term foundational goals:"

Our performance in the second quarter was solid on many fronts. We continue to see strong revenue growth with total revenue for the quarter of $16.5 billion, which is a 40% increase year-over-year. We are encouraged by the broad demand for our solution across a wide range of customers and saw continued adoption through our core sales channels including professional sales, direct-to-user, and distribution.

_____

[7]     The 2Q21 10-Q was signed by Defendant Fruchterman and he executed a certification pursuant to SOX that the report fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

This included the progress we made this quarter in medical school adoption and international commercial expansion as well as growing our presence in veterinary medicine.

94.     CFO Fielding backed up Fruchterman's positive outlook for the quarter:

We are particularly proud of the solid year-over-year growth in product revenue, given a tougher comparable in Q2 2020. Last year, we saw sales accelerate for COVID -related use cases during the second quarter. Subscription revenue was $3.5 million in the second quarter, growing approximately 94% from $1.8 million in Q2 2020. Our subscription mix, which we define as the percentage of total revenue recognized in a reporting period that is subscription-based, was 21% compared with 15% in the second quarter of 2020, a 6% point increase.

95.     Fielding described the slowing of subscription growth as a temporary decline:

 I would like to give some additional color on short-term trends in revenue mix, specifically, subscription mix. At this point in our early evolution, accelerated product sales actually reduces the subscription revenues as a percentage of total revenues. We recognize product revenues immediately, whereas subscription revenues are amortized over the life of the contract. **As such, the more successful we are at ramping product sales in the near term, the more subscription revenue percentage may decline temporarily. However, we would expect the impact to re-accelerate later in our maturity curve.**

96.     Fielding downplayed any delivery challenges and  represented that the Company was on track to meet its guidance for the year:

We do not see near-term delivery challenges and we'll continue to work aggressively to secure supply on behalf of our customers. And we are actively implementing new operating efficiencies to help offset the cost increases in component parts for our device. **Despite some of these challenges, we remain on track with important momentum and interest from a wide range of customers….[W]e believe we have a strong pipeline and demand for our solution across the breadth of use cases afforded by our team, and still see our annual performance shaping up to be in the guidance range we've provided in Q1 and referenced on the slide.**

**D.     Butterfly Falls Short Of Its Revenue And Gross Margin Guidance**

97.     On November 15, 2021, Butterfly filed with the SEC a Current Report on Form 8-K attaching a press release that announced disappointing financial results for the third quarter of 2021, falling short of its previous guidance:

Third quarter revenue increased 44.3% to $14.6 million from $10.1 million in the third quarter of 2020. Product revenue increased 25.8% to $10.8 million from $8.6 million in the third quarter of 2020. Subscription revenue increased 149.2% to $3.8 million from $1.5 million in the third quarter of 2020.

Gross profit for the third quarter of 2021 was negative $5.1 million, compared to gross profit of a negative $69.3 million in the third quarter of 2020. Adjusted gross profit was $7.2 million for the third quarter of 2021, compared to an adjusted gross profit of negative $2.7 million in the third quarter of 2020.

Total gross margin for the quarter was negative 35%, compared to negative 683.3% in the third quarter of 2020. Adjusted gross margin was 49.3%, compared to a negative 26.3% in the third quarter of 2020. Adjusted gross margin excluded a $11.6 million non-recurring loss on purchase commitment related to an inventory supply agreement where the expected losses exceed the benefit of the contracts.

\*\*\*

**2021 Financial Guidance**

- Revenue is expected to be approximately $60 million to $62 million, or approximately 30% to 34% growth year-over-year.

- Gross margin is expected to be approximately 28% to 30%. Adjusted gross margin is expected to be approximately 48% to 50%.

- Net loss is expected to be approximately $(65) million to $(75) million. Adjusted EBITDA loss is expected to be approximately $(125) million to $(135) million.

98. In a conference call with investors and financial analysts that day, Defendant

Fruchterman addressed the missed guidance:

[W]e must reset expectations for revenue for the balance of the year….**[W]e are falling short of what's necessary to achieve the annual guidance provided by prior management one-year ago and reaffirmed by me in May of this year with the information I had having just joined the Company. For 2021, we now expect full-year revenue growth in the range of 30% to 34%.** This represents good progress in our current commercial activities, and mounting user enthusiasm about Butterfly, but is offset by healthcare logistical challenges, and doctor, nurse, and medical technician fatigue concurrent with COVID conditions and its broad consequences.

99.     Fielding attributed the missed guidance to slowed direct-to-user sales "due to a combination professional time and attention due to COVID surges and labor shortages…." Fielding adjusted downward the Company's previous guidance:

> In light of the theme Todd discussed earlier on the call, including the backdrop of COVID on healthcare, which has delayed system implementations and institutions, a longer sales and development cycle related to help systems adoption -- and the trends we're seeing in direct-to-user purchases, **we are adjusting our 2021 guidance, to reflect our views on the current pace of 2021. For the full year 2021, total revenue is projected to be approximately $60 to $62 million or 30% to 34% growth year-over-year.**
>
> Through the third quarter, we have seen consistent performance and adjusted gross margin and slower ramp in our expenses. As a result, **we have also updated these financial trends in our guidance for full-year adjusted gross margin and adjusted EBITDA**. Gross margin is expected to be 28% to 30%, and net loss is expected to be $65 million to $75 million, assuming no change in the fair value of our warrants. Adjusted gross margin is expected to be 48% to 50%, and adjusted EBITDA is expected to be negative $125 million to $135 million.

100.    In reaction to the news, Butterfly's stock price fell $1.08 per share, or 12.55%, to close at $7.52 per share on November 15, 2021.

101.    On February 28, 2022, Butterfly filed with the SEC a Current Report on Form 8-K attaching a press release in which the Company disclosed its fourth quarter and full year 2021 financial results, reporting weak revenue growth and falling short of the adjusted guidance given on November 15, 2021:

**Fourth Quarter 2021 Financial Results**

Fourth quarter revenue increased 21.3% to $19.0 million from $15.7 million in the fourth quarter of 2020. Product revenue increased 15.1% to $14.4 million from $12.5 million in the fourth quarter of 2020. Subscription revenue increased 46.2% to $4.6 million from $3.1 million in the fourth quarter of 2020.

Gross profit for the fourth quarter of 2021 was $7.5 million, compared to gross profit of $8.7 million in the fourth quarter of 2020. Adjusted gross profit was $10.1 million for the fourth quarter of 2021, compared to an adjusted gross profit of $4.9 million in the fourth quarter of 2020.

31

Total gross margin for the quarter was 39.7%, compared to 55.6% in the fourth quarter of 2020. Adjusted gross margin was 53.3%, compared to 31.2% in the fourth quarter of 2020.

***

**Full Year 2021 Financial Results**

Full year revenue increased 35.3% to $62.6 million from $46.3 million in full year 2020. Product revenue increased 24.8% to $47.9 million from $38.3 million in full year 2020. Subscription revenue increased 85.9% to $14.7 million from $7.9 million in 2020.

Gross profit for the full year 2021 was $17.1 million, compared to gross profit of negative $61.2 million in full year 2020. Adjusted gross profit was $31.6 million for the full year 2021, compared to an adjusted gross profit of $1.6 million in full year 2020.

Total gross margin for the full year 2021 was 27.3%, compared to a negative 132.4% in 2020. Adjusted gross margin was 50.5%, compared to 3.5% in full year 2020.

102.    On May 5, 2022, Butterfly filed with the SEC a Current Report on Form 8-K attaching a press release in which the Company disclosed its first quarter financial results for 2022:

**First Quarter 2022 Financial Results**

First quarter total revenue increased 25.2% to $15.6 million from $12.4 million in the first quarter of 2021. Product revenue increased 14.8% to $11.0 million from $9.6 million in the first quarter of 2021. Subscription revenue increased 60.1% to $4.6 million from $2.8 million in the first quarter of 2021.

Gross profit for the first quarter of 2022 was $8.3 million, compared to gross profit of $6.4 million in the first quarter of 2021. Adjusted gross profit was $8.8 million for the first quarter of 2022, compared to an adjusted gross profit of $5.9 million in the first quarter of 2021.

Total gross margin for the quarter was 53.6%, compared to 51.6% in the first quarter of 2021. Adjusted gross margin was 56.3%, compared to 47.8% in the first quarter of 2021.

Total operating expenses for the quarter were $57.9 million, compared to $60.2 million in the first quarter of 2021, representing a decrease of 3.8%.

Net loss for the first quarter of 2022 was $44.5 million, compared to a net loss of $0.7 million during the first quarter of 2021. Adjusted EBITDA was a loss of $40.0

million during the first quarter of 2022, compared to a loss of $26.5 million in the first quarter of 2021.

103.    Analysts were disappointed with the posted revenue for the first quarter, noting that the Company posted losses of $44.5 million on sales of $15.6 million, missing analyst expectations that sales would reach $17.7 million for the quarter.[8]

**E.    Butterfly's CFO Resigns Following The Release Of The Financial Results**

104.    On February 4, 2002, Butterfly filed with the SEC a Current Report on Form 8-K disclosing that on January 31, 2022, following the disappointing financial results for fiscal year 2021, CFO Fielding delivered her resignation, effective on April 30, 2022. Fielding joined the Company in April 2020 as Senior Vice President of Finance and was promoted to CFO in November 2020.

105.    In a separation agreement attached to the Form 8-K, the Company disclosed the terms of Fielding's departure, including severance benefits in the form of a $150,000 annual bonus and various stock options, a non-disparagement agreement, and a release of all claims against the Company.

**F.    Butterfly Is Sued In A Securities Class Action**

106.    On February 16, 2022, *Rose v. Butterfly Network, Inc. et al.,* No. 2:22-cv-00854-JXN-JBC (D.N.J.) (the "Securities Class Action") was filed seeking damages on behalf of a class of persons who purchased or otherwise acquired Butterfly securities between February 16, 2021 and November 15, 2021, inclusive, and/or all holders of Butterfly common stock entitled to vote on the Merger as of the record date for the special meeting of shareholders held on February 12, 2021 to consider approval of the Merger. Rose charges the Company, Defendants Rothberg,

---

[8]    Sean Whooley, *Butterfly Shares Dip on Q1 Losses as Revenues Miss Analysts' Expectations, Mass Device*, May 5, 2022, https://www.massdevice.com/butterfly-shares-dip-on-q1-losses-as-revenues-miss-analysts-expectations/.

Fruchterman, and Robbins, Fielding, and other officers and directors of Longview with violations of Sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC as well as Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC. Rose alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (i) Butterfly had overstated its post-Merger business and financial prospects; (ii) notwithstanding the ongoing COVID-19 pandemic, Butterfly's financial projections failed to take into account the pandemic's broad consequences, which included healthcare logistical challenges, and medical personnel fatigue; (iii) accordingly, Butterfly's gross margin levels and revenue projections were less sustainable than the Company had represented; (iv) all the foregoing was reasonably likely to have a material negative impact on Butterfly's business and financial condition; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### G.    Butterfly Is Sued For Patent Infringement

107.    On March 9, 2022, *Fujifilm Sonosite, Inc., v. Butterfly Network, Inc.*, No. 1:22-cv-00309-JPM (D. Del), was filed against the Company alleging patent infringement under Title 35 of the United States Code regarding seven of Butterfly's patents. Fujifilm alleges that Butterfly violated seven patents tied to handheld, point of care ultrasound including intellectual property pertaining to processing and displaying medical images, elements of its graphical interface, and the use of a probe attached to a mobile device.

### H.    The Individual Defendants Ignored Red Flags

108.    Butterfly suffered from a lack of internal controls over financial reporting. According to the 2020 10-K/A, on April 12, 2021, the SEC issued a public statement entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose

Acquisition Companies ("SPACs")" (the "Statement"). In the Statement, the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity.

109.    Based on the Statement, Butterfly's management concluded that public warrants and private placement warrants were erroneously presented as equity as opposed to liabilities on the Company's balance sheet. This error forced Butterfly's Audit Committee to require a restatement of the financial statements reported in the Company's Quarterly Reports filed with the SEC on August 14, 2020, for the period ended June 30, 2020 and on November 16, 2020 for the period ended September 30, 2020; and the 2020 10-K. During the restatement, the Audit Committee, comprised of Defendants Phanstiel, Pettiti and Hammergren, discovered a material weakness in the Company's internal controls:

> [O]n May 2, 2021, the Audit Committee of the Company's Board of Directors, in consultation with management, concluded that the Company's previously issued financial statements as of December 31, 2020 and for the period from February 4, 2020 (inception) through December 31, 2020 and the unaudited condensed financial statements as of and for the three months ended June 30, 2020 and September 30, 2020 and for the periods from February 4, 2020 (inception) through June 30, 2020 and September 30, 2020 should be restated to reflect the impact of this guidance by the SEC and accordingly, should no longer be relied upon. As part of such process, we identified a material weakness in our internal controls over financial reporting, namely that our controls over the review of certain material non-routine transactions or events were not effective.

110.    In violation of their fiduciary duties, the Individual Defendants ignored these red flags.  Had the Individual Defendants timely acted the damage to Butterfly pled herein would not have occurred or at least would have been minimized.

I.       **Butterfly's Materially False And Misleading Proxy Statement**

111.    On May 2, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect the Individual Defendants to the Board. The 2022 Proxy was issued by order of the Board and signed by Defendant Fruchterman.

112.    The 2022 Proxy represents that the Board oversees and monitors the Company's risk exposures:

**Role of Board in Risk Oversight**

The board of directors have extensive involvement in the oversight of risk management related to the Company and its business and accomplishes this oversight through the regular reporting to the board of directors by the audit committee. The audit committee periodically reviews the Company's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the audit committee reviews and discusses all significant areas of our business and summarizes for the board of directors areas of risk and the appropriate mitigating factors. In addition, the board of directors receives periodic detailed operating performance reviews from management.

113.    The 2022 Proxy represented that the Audit Committee was responsible for overseeing and monitoring the "quality and integrity of the financial statements" and the "compliance with legal and regulatory requirements."

114.    The foregoing statements in the 2022 Proxy were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) to implement and maintain an effective system of internal controls and corporate governance to ensure the Company was making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls

relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

115.    These false and misleading statements and omissions are an essential link in the election of the Individual Defendants to the Board.  As a result of the misleading statements in the 2022 Proxy, Butterfly's stockholders risk re-electing the Individual Defendants to the Board.

## VI.    DEMAND FUTILITY AND DERIVATIVE ALLEGATIONS

116.    Plaintiff brings this action derivatively and for the benefit of Butterfly to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Butterfly, as well as the aiding and abetting thereof, gross mismanagement, and waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

117.    Plaintiff is a stockholder of the Company and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting their rights.

118.    Under the circumstances presented herein, demand is futile and, thus, excused.

### A.    Demand Upon Defendant Fruchterman Is Excused

119.    As admitted by Butterfly in its public filings, Defendant Fruchterman is the Company's President and CEO since the Merger and therefore is not independent under NYSE listing rules. Indeed, Butterfly's 2022 Proxy does not list Fruchterman as an independent director.

120.    As an employee of Butterfly, the Company provides Defendant Fruchterman with his principal occupation from which he receives substantial compensation, including $34,816,164 in fiscal year 2021 alone.  Thus, Fruchterman could not consider a demand for action that might

require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

121.    Fruchterman will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Fruchterman holds 757,398 shares of Butterfly Class A common stock.  If Fruchterman acknowledged that he, Butterfly, or others engaged in misconduct, his investment in Butterfly would be substantially devalued.  Further, if Fruchterman acknowledged that executives at Butterfly had engaged in the wrongdoing alleged, he would be acknowledging that he, as the President and CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

122.    Defendant Fruchterman is named as a defendant in the pending Securities Class Action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

123.    Fruchterman signed the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

124.    Fruchterman is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Butterfly Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

125.    Robbins and Fruchterman's personal relationship prevents them from acting in an independent and disinterested manner. A trust funded by Defendant Robbins formed a limited liability company with Fruchterman and his wife and the trust contributed $1.5 million for the purchase of the Fruchtermans' principal residence when Fruchterman joined the Board. The 2022 Proxy describes this connection:

> As part of the recruitment process of Dr. Fruchterman, our current President and Chief Executive Officer, Larry Robbins, at the time the Chairman of Longview, our

predecessor prior to the Business Combination, and now a member of our board of directors, offered financial support to facilitate Dr. Fruchterman's relocation to be near the Company's headquarters. On February 2, 2022, Dr. Fruchterman, Dr. Fruchterman's spouse, and an irrevocable trust previously established by Mr. Robbins formed a limited liability company and entered into an operating agreement setting forth the terms and conditions of the ownership and management of the limited liability company that has purchased real estate in the approximate amount of $4,800,000 that will serve as Dr. Fruchterman's principal residence. Mr. Robbins' trust contributed approximately $1,500,000 to the limited liability company.

126.    Fruchterman, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

127.    Fruchterman is neither disinterested nor independent. Any demand upon Defendant Fruchterman is futile and, thus, excused.

### B.    Demand Upon Defendant Rothberg Is Excused

128.    As admitted by Butterfly in its public filings, Defendant Rothberg founded Butterfly in 2011, is a controlling shareholder of the Company, and has served as the Chairman of the Board since its inception. Indeed, Butterfly's 2022 Proxy does not list Rothberg as an independent director.

129.    Rothberg's total compensation for his service on the Board in 2021 was $501,725. Rothberg earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the

median director compensation per year at a small cap company like Butterfly[9] is $186,000, about 63% less than that of a Butterfly director. In addition to Rothberg's compensation as a director, Rothberg serves as a consultant to Fruchterman and the Butterfly Board earning a consulting fee of $16,667 per month. Further, in December 2020, the Legacy Butterfly board of directors granted 1,000,000 restricted stock units to Rothberg.[10] Defendant Rothberg is a controlling shareholder of Butterfly, with beneficial ownership of 100% of the Company's Class B common shares and 10,011,285 Butterfly Class A common shares, with a total voting power of 76.8%. If Rothberg acknowledged that he, Butterfly, or others engaged in misconduct, his investment in Butterfly would be substantially devalued and his lucrative position jeopardized.

130.    Defendant Rothberg is named as a defendant in the Securities Class Action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

131.    Rothberg authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132.    Rothberg is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Butterfly Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

133.    Defendant Rothberg and Robbins's business relationships preclude them from acting in an independent and disinterested manner. Defendant Robbins is the Founder, Portfolio

---

[9]     The FW Cook survey defines a small cap company as one with a market capitalization of $2 billion or less with a median market capitalization of $646 million.

[10]    The RSUs vest in equal quarterly installments over two years, beginning on March 31, 2021, without regard to Rothberg's continued service to the Company, with full acceleration of vesting in the event of Rothberg's death or disability or a change in control of the Company.

Manager, and CEO of Glenview, a hedge fund. Rothberg and Robbins' relationship dates to 2010 when Life Technologies Corporation ("Life Technologies"), a significant Glenview investment, purchased Ion Torrent Systems, Inc. ("Ion Torrent"), a company founded by Rothberg. In an interview with CNBC in November 2020, Defendant Rothberg called Defendant Robbins "the perfect partner," who Rothberg "needed" as a complement to his own personality and skills.[11] Glenview beneficially owns 17,330,506 Butterfly Class A common shares, amounting to 1.8% total voting power. Longview itself was formed as a SPAC through an affiliate of Glenview.[12] If Rothberg acknowledged that he, Butterfly, or others engaged in misconduct, Glenview's investment in Butterfly would be devalued and Rothberg's lucrative position at Butterfly would be jeopardized.

134.    In 2021, HighCape Capital Acquisition Corp., a healthcare-focused SPAC, merged with Quantum-Si, one of the companies that was incubated through 4Catalyzer, which was created by Defendant Rothberg.[13] The merger was supported by a $425 million PIPE from institutional investors including Glenview. Defendant Rothberg is the Executive Chairman and a controlling shareholder of the combined company. As of February 15, 2022, Glenview owns 6,000,000 Class A common shares of Quantum-Si, with voting control over more than 5% of the Company.[14]

---

[11]    CNBC Television, November 20, 2020, at 1:21-1:55, https://www.youtube.com/watch?v=fI7cDemsHCc.

[12]    As a result of the Merger, Butterfly received approximately $589 million prior to transaction fees, including approximately $414 million of cash held in Longview's trust account and $175 million from private placement ("PIPE") investors, including Glenview.

[13]    Quantum-Si Press Release, https://ir.quantum-si.com/news/news-details/2021/Quantum-Si-Revolutionizing-Proteomics-Closes-Business-Combination-and-Will-Begin-Trading-Under-the-Ticker-QSI-on-the-Nasdaq-Stock-Exchange/default.aspx.

[14]    This information was obtained from Quantum-Si's latest proxy statement filed with the SEC on March 29, 2022.

Rothberg founded Tesseract through his incubator, 4Catayler, in 2018. Glenview helped fund Tesseract's Series B fundraising round. Lee Hathaway, a partner, and co-head of Healthcare Investing at Glenview, also serves on the board of Tesseract.

135.   Butterfly, Tesseract, Quantum-Si and other companies incubated by 4Catalyzer entered into an Amended and Restated Technology and Services Exchange Agreement ("ARTSA"), detailed in the 2022 Proxy, which became effective upon the completion of the Merger, to share non-core technology and services:

> Under the ARTSA, Legacy Butterfly and the other participant companies agreed to share certain non-core technologies, which means any technologies, information or equipment owned or otherwise controlled by the participant company that are not specifically related to the core business area of the participant, such as software, hardware, electronics, fabrication and supplier information, vendor lists and contractor lists, subject to certain restrictions on use, with the other participant companies....The ARTSA also provided for 4Catalyzer to perform certain services to Legacy Butterfly and each other participant company, such as general administration, facilities, information technology, financing, legal, human resources and other services.

Consequently, if Rothberg acknowledged that he, Butterfly, or others engaged in misconduct, Glenview's investments in the other 4Catalyzer companies would be devalued and Rothberg's position at those companies would be jeopardized.

136.   Defendant Rothberg and Edelman's business relationship precludes them from acting in an independent and disinterested manner. Rothberg is the founder of Tesseract and Edelman serves as a medical advisor to Tesseract.

137.   Defendant Rothberg and Phanstiel's business relationship precludes them from acting in an independent and disinterested manner. Phanstiel serves as Chair of the Board of Myriad Genetics, Inc. since 2020 and as a director at Myriad since 2009. On April 29, 2013, Myriad participated in the Series E Fundraising round for Raindance Technologies ("Raindance"),

co-founded by Defendant Rothberg in 2004.[15] Raindance used the funding to expand its products, operations, and manufacturing. Following the closing of the financing round, Raindance named Myriad as a new strategic equity investor. The two companies entered into a multi-year commercial supply agreement whereby Myriad utilized RainDance's ThunderStorm system for targeted sequencing of Myriad's Hereditary Cancer Panel. As part of the agreement, RainDance supplied Myriad with ThunderStorm systems, gene panels, consumables, and reagents.

138.    Defendant Rothberg's brother and his children earn a substantial income from Butterfly's leased offices. If Rothberg acknowledged that he, Butterfly, or others engaged in misconduct, it would jeopardize a substantial source of income for the Rothberg family. The 2022 Proxy details the lease arrangements:

> We occupy office and laboratory space located at 506 Old Whitfield Street, Guilford, Connecticut, which is owned by Oceanco, LLC, whose manager is Michael Rothberg, who is a sibling of Jonathan M. Rothberg, Ph.D., the founder of Legacy Butterfly and Chairman of our board of directors, and which is owned by Dr. Rothberg's children. Under this arrangement, we paid $184,800, $184,800 and $169,400 for the years ended December 31, 2019, 2020 and 2021, respectively. We entered into a month-to-month lease with Oceanco, LLC for this space pursuant to the Business Combination.
>
> We also occupy office space at 351 New Whitfield Street, Guilford, Connecticut, 485 Old Whitfield Street, Guilford, Connecticut, and 3000 El Camino Real, Suite 130, Palo Alto, California. Effective upon the Closing, the office space at 485 Old Whitfield Street, Guilford, Connecticut was leased from Oceanco, LLC by 4Catalyzer Corporation, or 4Catalyzer, of which Michael Rothberg, who is a sibling of Jonathan M. Rothberg, Ph.D., the founder of Legacy Butterfly and Chairman of the Company's board of directors, is the sole stockholder, and we have the right to use rooms at 485 Old Whitfield Street from 4Catalyzer for $100 per employee per day. Effective upon the Closing of the Business Combination, 4Catalyzer subleases space to us at 351 New Whitfield Street, where we occupy such portions of the space as 4Catalyzer may designate from time to time on a month-to-month basis,

---

[15]    Patricia Resende, *Raindance Technologies Closes $20M; Plans to Move HQ*, Boston Business Journal, April 29, 2013, https://www.bizjournals.com/boston/blog/bioflash/2013/04/raindance-technologies-closes-20m.html.

and we pay a pro rata share of expenses paid by 4Catalyzer for such space under the master lease. In connection with the Business Combination Agreement, 4Catalyzer assigned its leasehold interest 3000 El Camino Real to us. We pay 4Catalyzer on a per diem and month-to-month basis, respectively, for use of the spaces in 485 Old Whitfield Street and 351 New Whitfield Street, but no rental or lease agreements are effective. Under these arrangements (and through the date of assignment of the 3000 El Camino Real Lease), we paid $248,650, $305,493 and $40,730 for the years ended December 31, 2019, 2020 and 2021, respectively.

139.     Rothberg, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

140.     Rothberg failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

141.     Rothberg is neither disinterested nor independent.  Any demand upon Defendant Rothberg is futile and, thus, excused.

### C.     Demand Upon Defendant Robbins Is Excused

142.     Defendant Robbins is a Butterfly director since February 2020 and was the CEO of Longview before the Merger. Robbins earned $442,326 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Robbins earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly

director . If Robbins acknowledged that he, Butterfly, or others engaged in misconduct, Robbins' lucrative position at Butterfly would be jeopardized.

143.    Defendant Robbins is named as a defendant in the Securities Class Action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

144.    Robbins authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

145.    Robbins is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Butterfly Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

146.    Defendant Robbins and Rothberg's business relationships preclude them from acting in an independent and disinterested manner. Robbins is the Founder, Portfolio Manager, and CEO of Glenview, a hedge fund. Rothberg and Robbins' relationship dates to 2010 when Life Technologies, a significant Glenview investment, purchased Ion Torrent, a company founded by Rothberg. In an interview with CNBC in November 2020, Defendant Rothberg called Defendant Robbins "the perfect partner," who Rothberg "needed" as a complement to his own personality and skills.[16] Glenview beneficially owns 17,330,506 Butterfly Class A common shares, amounting to 1.8% total voting power. Longview itself was formed as a SPAC through an affiliate of Glenview.[17] If Robbins acknowledged that he, Butterfly, or others engaged in misconduct,

---

[16]    CNBC Television, November 20, 2020, at 1:21-1:55, https://www.youtube.com/watch?v=fI7cDemsHCc.

[17]    As a result of the Merger, Butterfly received approximately $589 million prior to transaction fees, including approximately $414 million of cash held in Longview's trust account and $175 million from private placement ("PIPE") investors, including Glenview.

Glenview's investment in Butterfly would be devalued, it would undermine Robbins and Glenview's credibility, and weaken their ability to attract future business.

147.    In 2021, HighCape Capital Acquisition Corp., a healthcare-focused SPAC, merged with Quantum-Si, one of the companies that was incubated through 4Catalyzer, which was created by Defendant Rothberg.[18] The merger was supported by a $425 million PIPE from institutional investors including Glenview. Defendant Rothberg is the Executive Chairman and a controlling shareholder of the combined company. As of February 15, 2022, Glenview owns 6,000,000 Class A common shares of Quantum-Si, with voting control over more than 5% of the Company.[19]

148.    Defendant Rothberg founded Tesseract through his incubator, 4Catalyzer, in 2018. Glenview helped fund Tesseract's Series B fundraising round. Lee Hathaway, a partner, and co-head of Healthcare Investing at Glenview, also serves on the board of Tesseract.

149.    Butterfly, Tesseract, Quantum-Si and other companies incubated by 4Catalyzer entered into an Amended and Restated Technology and Services Exchange Agreement ("ARTSA"), detailed in the 2022 Proxy, which became effective upon the completion of the Merger, to share non-core technology and services:

   Under the ARTSA, Legacy Butterfly and the other participant companies agreed to share certain non-core technologies, which means any technologies, information or equipment owned or otherwise controlled by the participant company that are not specifically related to the core business area of the participant, such as software, hardware, electronics, fabrication and supplier information, vendor lists and contractor lists, subject to certain restrictions on use, with the other participant companies….The ARTSA also provided for 4Catalyzer to perform certain services to Legacy Butterfly and each other participant company, such as general

[18]    Quantum-Si Press Release, https://ir.quantum-si.com/news/news-details/2021/Quantum-Si-Revolutionizing-Proteomics-Closes-Business-Combination-and-Will-Begin-Trading-Under-the-Ticker-QSI-on-the-Nasdaq-Stock-Exchange/default.aspx.

[19]    This information was obtained from Quantum-Si's latest proxy statement filed with the SEC on March 29, 2022.

administration, facilities, information technology, financing, legal, human resources and other services.

Consequently, if Robbins acknowledged that he, Butterfly, or others engaged in misconduct, Glenview's investments in the other 4Catalyzer companies would be devalued.

150.    Defendant Robbins and Hammergren's business relationship precludes them from acting in an independent and disinterested manner. Hammergren served as the Chairman of the Board and President and CEO of McKesson Corporation for almost twenty years until resigning in 2019. Glenview, the hedge fund founded and run by Robbins, is a significant investor in McKesson.

151.    Robbins' and Fruchterman's personal relationship precludes them from acting in an independent and disinterested manner. A trust funded by Defendant Robbins formed a limited liability company with Fruchterman and his wife and the trust contributed $1.5 million for the purchase of the Fruchtermans' principal residence when Fruchterman joined the Board. The 2022 Proxy describes this connection:

> As part of the recruitment process of Dr. Fruchterman, our current President and Chief Executive Officer, Larry Robbins, at the time the Chairman of Longview, our predecessor prior to the Business Combination, and now a member of our board of directors, offered financial support to facilitate Dr. Fruchterman's relocation to be near the Company's headquarters. On February 2, 2022, Dr. Fruchterman, Dr. Fruchterman's spouse, and an irrevocable trust previously established by Mr. Robbins formed a limited liability company and entered into an operating agreement setting forth the terms and conditions of the ownership and management of the limited liability company that has purchased real estate in the approximate amount of $4,800,000 that will serve as Dr. Fruchterman's principal residence. Mr. Robbins' trust contributed approximately $1,500,000 to the limited liability company.

152.    Robbins, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate

47

and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

153.    Robbins failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

154.    Robbins is neither disinterested nor independent.  Any demand upon Defendant Robbins is futile and, thus, excused.

### D.    Demand Upon Defendant Carfora Is Excused

155.    Defendant Carfora will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Carfora  holds 16,394 Butterfly Class A common shares. Carfora received $497,163 in compensation in the form of fees and stock and option awards for her service as a director in 2021. Carfora earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly director. If Carfora acknowledged that she, Butterfly, or others engaged in misconduct, her investment in Butterfly would be substantially devalued and her lucrative position jeopardized.

156.    Carfora, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate

and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

157.    Carfora is neither disinterested nor independent.  Any demand upon Defendant Carfora is futile and, thus, excused.

### E.    Demand Upon Defendant Edelman Is Excused

158.    Defendant Edelman will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Edelman holds 5,032 Butterfly Class A common shares. Edelman received $502,979 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Edelman earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly director. If Edelman acknowledged that he, Butterfly, or others engaged in misconduct, his investment in Butterfly would be substantially devalued and his lucrative position jeopardized.

159.    Defendant Rothberg and Edelman's business relationship precludes them from acting in an independent and disinterested manner. Rothberg is the founder of Tesseract and Edelman serves as a paid advisor to Tesseract.

160.    Edelman, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful,

accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, ability to meet its financial guidance, and the legality of the Company's patents.

161.    Edelman is neither disinterested nor independent.  Any demand upon Defendant Edelman is futile and, thus, excused.

**F.    Demand Upon Defendant Hammergren Is Excused**

162.    Defendant Hammergren will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Hammergren holds 124,484 Butterfly Class A common shares. Hammergren received $503,788 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Hammergren earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly director. If Hammergren acknowledged that he, Butterfly, or others engaged in misconduct, his investment in Butterfly would be substantially devalued and his lucrative position jeopardized.

163.    Defendant Hammergren's and Robbins' business relationship precludes them from acting in an independent and disinterested manner. Hammergren served as the Chairman of the Board and President and CEO of McKesson Corporation for almost twenty years until resigning in 2019. Glenview, the hedge fund founded and run by Robbins, is a significant investor in McKesson.

164.    Hammergren, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

165.    As a member of the Audit Committee, Hammergren had duties regarding oversight of the risks facing the Company and Butterfly's compliance with relevant laws, rules, and regulations. Hammergren utterly failed to perform these essential duties.

166.    Hammergren failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

167.    Hammergren is neither disinterested nor independent.   Any demand upon Defendant Hammergren is futile and, thus, excused.

### G.    Demand Upon Defendant Pettiti Is Excused

168.    Defendant Pettiti will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Pettiti holds 22,399 Butterfly Class A common shares. Pettiti received $512,621 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Pettiti earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly

director. If Pettiti acknowledged that he, Butterfly, or others engaged in misconduct, his investment in Butterfly would be substantially devalued and his lucrative position jeopardized.

169.    Pettiti, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

170.    As a member of the Audit Committee, Pettiti had duties regarding oversight of the risks facing the Company and Butterfly's compliance with relevant laws, rules, and regulations. Hammergren utterly failed to perform these essential duties.

171.    Pettiti is neither disinterested nor independent.  Any demand upon Defendant Pettiti is futile and, thus, excused.

**H.    Demand Upon Defendant Phanstiel Is Excused**

172.    Defendant Phanstiel will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Phanstiel holds 64,434 Butterfly Class A common shares. Phanstiel received $514,829 in compensation in the form of fees and stock and option awards for her service as a director in 2021. Phanstiel earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly director. If Phanstiel acknowledged that she, Butterfly, or others engaged

in misconduct, her investment in Butterfly would be substantially devalued and her lucrative position jeopardized.

173.     Defendant Phanstiel's and Rothberg's business relationship precludes them from acting in an independent and disinterested manner. Phanstiel is Chair of the Board of Myriad Genetics, Inc. since 2020 and a Myriad director since 2009. On April 29, 2013, Myriad participated in the Series E Fundraising round for Raindance, co-founded by Defendant Rothberg in 2004.[20] Raindance used the funding to expand its products, operations, and manufacturing.  Following the closing of the financing round, Raindance named Myriad as a new strategic equity investor. The two companies entered into a multi-year commercial supply agreement whereby Myriad utilized RainDance's ThunderStorm system for targeted sequencing of Myriad's Hereditary Cancer Panel. As part of the agreement, RainDance supplied Myriad with ThunderStorm systems, gene panels, consumables, and reagents.

174.     Phanstiel, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

---

[20]     Patricia Resende, *Raindance Technologies Closes $20M; Plans to Move HQ*, Boston Business Journal, April 29, 2013,
https://www.bizjournals.com/boston/blog/bioflash/2013/04/raindance-technologies-closes-20m.html.

175.    As Chair of the Audit Committee, Phanstiel had duties regarding oversight of the risks facing the Company and Butterfly's compliance with relevant laws, rules, and regulations. Hammergren utterly failed to perform these essential duties.

176.    Phanstiel is neither disinterested nor independent.  Any demand upon Defendant Phanstiel is futile and, thus, excused.

**I.    Demand Upon Defendant Schwartz Is Excused**

177.    Defendant Schwartz will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Schwartz received $318,044 in compensation in the form of fees and stock awards for her service as a director in 2021. Schwartz earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a small cap company like Butterfly is $186,000, about 63% less than that of a Butterfly director. If Schwartz acknowledged that she, Butterfly, or others engaged in misconduct, her lucrative position would be jeopardized.

178.    Schwartz, as a director of Butterfly, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Butterfly's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

179.    Schwartz failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

180.    Schwartz is neither disinterested nor independent.  Any demand upon Defendant Schwartz is futile and, thus, excused.

**J.      Other Factors Demonstrating That Demand
         Upon The Individual Defendants Is Excused**

181.    Butterfly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

182.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

183.    Publicly traded companies, such as Butterfly, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Butterfly's damages.

## VII.  CLAIMS FOR RELIEF

**COUNT ONE**
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

184.    Plaintiff repeats and re-alleges each and every allegation contain ed above as if fully set forth herein.

185.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness regarding those non-fraud claims.

186.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

188.    The 2022 Proxy was materially false and misleading because the Individual Defendants failed to: (1) implement and maintain an effective system of internal controls and corporate governance and ensure that the Company was making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding the lack of internal controls relating to the Company's financial reporting, inability to meet its financial guidance, and the legality of the Company's patents.

189.    The misleading information contained in the 2022 Proxy is material to Butterfly's shareholders in determining whether to elect the Individual Defendants to the Board.

190.    The material misstatements and omissions in the 2022 Proxy have damaged and will continue to damage the Company.

191.    Plaintiff, on behalf of Butterfly, seeks relief for damages that have been and will be inflicted upon the Company arising from the misleading 2022 Proxy in connection with the improper election of the Individual Defendants to the Board.

<u>**COUNT TWO**</u>
**Against the Individual Defendants**
**for Breach of Fiduciary Duties**

192.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

193.    The Individual Defendants owed and owe fiduciary duties to Butterfly.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Butterfly the highest obligation of good faith and loyalty in the administration of Butterfly's affairs, including assuring that Butterfly complied with state and federal laws governing, among other things, the making of truthful, complete and accurate public statements regarding the Company's financial

condition and business prospects and intellectual property rights.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Butterfly alleged herein.

194.   The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

195.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of Butterfly in a manner consistent with the duties imposed upon them by law.

196.   By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Butterfly's affairs and in the use and preservation of Butterfly's assets.

197.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Butterfly has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action and the patent infringement lawsuit.

198.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**
**Against the Individual Defendants**
**for Contribution and Indemnification**

199.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

200.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

201.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

**COUNT FOUR**
**Against the Individual Defendants**
**for Aiding and Abetting**

202.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

203.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

204.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

205.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

206.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT FIVE**
**Against the Individual Defendants**
**for Gross Mismanagement**

207.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

208.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

209.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

210.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

**VIII.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of Butterfly and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Butterfly;

(d)      Declaring that the Individual Defendants have grossly mismanaged Butterfly;

(e)      Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight concerning financial reporting;

(f)      Determining and awarding to Butterfly the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)      Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)      Awarding Butterfly restitution from the Individual Defendants, and each of them;

(i)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)      Granting such other and further relief as the Court may deem just and proper.

IX.    **JURY DEMAND**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: June 21, 2022                                    Respectfully submitted,

                                                       **COOCH AND TAYLOR, P.A.**

                                                       */s/ Blake A. Bennett*
                                                       Blake A. Bennett (#5133)
**OF COUNSEL**                                         Andrew A. Ralli (#6733)
                                                       The Nemours Building
David C. Katz                                          1007 N. Orange St., Suite 1120
Mark D. Smilow                                         Wilmington, DE  19801
Joshua M. Rubin                                        Telephone: (302) 984-3800
**WEISS LAW**                                          Email: bbennett@coochtaylor.com
305 Broadway, 7th Floor
New York, NY 10007                                     *Attorneys for Plaintiff*
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
       msmilow@weisslawllp.com
       jrubin@weisslawllp.com

*Plaintiff's Counsel*